70 So.2d 244

**WAGNON v. PATTERSON.**

I Div. 540.

Supreme Court of Alabama.

Jan. 21, 1954.

T. K. Jackson, Jr., and Inge, Twitty, Armbrecht & Jackson, Mobile, for appellant.

Herndon · H. ' Wilson, Mobile, for appellee.

MERRILL, Justice.

Defendant, Mr. Wagnon, has appealed from a judgment in the Circuit Court of Mobile County in favor of plaintiff, Mr. Patterson, against him and Mrs. Ella Jean Weeks, who has not joined in this appeal. The judgment against both defendants was under Count One of the complaint as amended, which charged simple negligence. The complaint was in two counts. Count two charged both defendants with wilful or wanton conduct. The trial court submitted both counts to the jury.

The plaintiff, Mr. Patterson, was an occupant of Mr. Wagnon's automobile at the time that it was involved in an accident with an automobile of the other defendant, Mrs. Ella Jean Weeks. Mr. Patterson and Mr. Wagnon were both employed at Brookley Field.

On the afternoon of the accident they left Brookley Field at approximately four p. m. and proceeded north on Washington Avenue, a thoroughfare in the City of Mobile. Mr. Wagnon was driving. Mr. Patterson was sitting to his right on the front seat and one Mr. Elbe was sitting alone on the back seat. As Mr. Wagnon approached the intersection of Washington Avenue and Charleston Street, he was driving at a speed of approximately 20 to

**300**

30 miles per hour. There were no cars in front of him within one-half block. There was a blinker light at this intersection, blinking yellow or amber toward the traffic approaching from the south, as was Mr. Wagnon, and blinking red toward traffic approaching from the east, which was the direction from which Mrs. Weeks was approaching. As Mr. Wagnon entered the intersection from the south, the automobile driven by Mrs. Weeks entered from the east. It is undisputed that Mrs. Weeks slowed her car at the intersection, but she stated that as she reached for the brake with her foot, she stepped on the accelerator and drove her automobile into Mr. Wagnon's automobile. As a result of this collision Mr. Patterson received serious injuries.

The assignments of error raise the questions of law as to (1) whether the allegation that plaintiff was riding in defendant's automobile "on a share expense basis" was subject to appellant's demurrer, (2) whether there was liability under the Alabama Guest Statute, (3) whether the injection of the matter of insurance coverage entitled defendant to a mistrial and (4) whether the motion for a new trial should have been granted.

Count One, as amended, the amendment being italicized reads as follows:

"The plaintiff claims of the defendants Twenty-Five Thousand Dollars ($25,000.00), as damages for that he avers that on, to-wit, the twenty-third day of February, 1950, the defendant, Joseph Wagnon, was running or operating an automobile upon and along Washington Avenue, a public street in the City and County of Mobile, State of Alabama, and the defendant, Ella Jean Weeks, was running or operating an automobile along or upon Charleston Street, a public street of said City, County and State, and then and there the two defendants so negligently operated said respective automobiles that said automobiles, with great force and violence, collided at the intersection of said Washington Avenue and Charleston Street, and as a proximate result

and consequence thereof, plaintiff who was then and there a passenger *on a share expense basis* of the said defendant Joseph Wagnon in the said automobile so run and operated by Joseph Wagnon, received many physical injuries externally and internally, was permanently injured, received permanent scars, was caused to suffer much physical and mental pain, was caused to expend large sums for medical, surgical, and hospital treatment, the taking of X-Rays, nurses' attention, doctors, etc., for his treatment, and will probably have to incur further expenses in the future; was caused to miss much time from work; for all of which he claims damages as aforesaid, hence this suit."

Defendant Wagnon demurred to this count on the ground that it did not show the existence of a relationship between plaintiff and defendant Wagnon by which a duty was imposed on Wagnon not to negligently injure Patterson.

Our Guest Statute, Title 36, § 95, Code of 1940, reads:

"The owner, operator or person responsible for the operation of a motor vehicle shall not be liable for loss or damage arising from injuries to or death of a guest while being transported without payment therefor in or upon said motor vehicle, resulting from the operation thereof, unless such injuries or death are caused by the willful or wanton misconduct of such operator, owner or person responsible for the operation of said motor vehicle."

We think the allegation that plaintiff was a "passenger on a share expense basis" is of such certainty as to apprise defendant that plaintiff was thereby asserting that he was not riding as a guest of defendant. "With respect to a count in a complaint charging negligence, it is sufficient to allege only the facts and circumstances from which the law imposes a duty to the plaintiff, and then a general charge of negligence *in performance of that duty* without a statement of the particular man-

ner in which it was negligently performed. 15 Alabama Digest, Negligence, ☜111(1), pages 336, 337." Birmingham Electric Co. v. Carver, 255 Ala. 471, 474, 52 So.2d 200, 203.

The question as to whether or not plaintiff was a guest in the case at bar, is a close and difficult one, and rather than attempt to give the effect of the evidence on this subject, we set it out in full.

Plaintiff on direct examination:

"Q. What, if any, arrangements were there between you and Mr. Wagnon as to your transportation? A. I only rode in the afternoon, and I agreed to give him 50¢ a week or a dollar a pay day. I just rode with him in the afternoon, just one way with him in to town, sharing the expense of the gasoline.

"Q. That was the arrangement? A. Yes, sir.

"Q. How long had you been doing that? A. Ever since Mr. Wagnon been bringing his car.

"Q. Well, about how long before this accident occurred? How long before the accident had you been doing that? A. About six or eight months.

"Q. And you had paid him regularly. A. Yes, sir. * * *"

Plaintiff on cross-examination:

"Q. As a matter of fact you do remember the first two times you rode with him, there wasn't anything said about paying him for it, don't you? A. No, sir. There was a mutual agreement made that I would pay him 50¢ a week to help share the expense of the gasoline—a dollar every pay day.

"Q. A dollar every pay day? A. Yes, sir, because I just rode in the afternoon.

"Q. And you say you don't remember when that conversation took place? A. I just know that it was before I started riding with him.

"Q. Was it before you rode with him the first time? A. Yes, sir.

"Q. Did you or not make a written statement as follows: Every pay day I would give him 50¢ to help out with the gas and oil. This, however, was not a charge, but more or less a donation. Did you or did you not make that written statement? A. I made a statement after I came home from the hospital but I don't know whether I made that statement or not.

"Q. I beg your pardon. A. I had just been home from the hospital about a week and I made a statement to the adjustor. Whether that was the exact words or not, I don't know.

"Q. Did you make that statement or did you not? A. I said the adjustor came out there and I hadn't been home but about a week. I made a statement but I don't remember it.

"Q. Did you or did you not make that statement I just read to you? A. Not 50¢ a pay day. It was 50¢ a week, a dollar a pay day.

"Q. Did you or did you not state that this money was not a charge but was more or less a donation? A. That it was a share on the expenses of the gasoline.

"Q. Won't you please answer my question, Mr. Patterson: Did you or did you not make a written statement as follows: Every pay day I would give him 50¢ to help out with the gas and oil. This, however, was not a charge but more or less a donation. Did you or did you not make that statement? A. We made the agreement. * * *"

Part of a written statement admittedly signed by plaintiff while in bed at his home at the request of an investigator investigating the accident for defendant Wagnon is as follows: "Joe Wagnon is a personal friend of mine and I was a regular rider in his automobile every afternoon. Every pay day I would give him 50¢ to help out with the gas and oil. This, however, was not a charge but more or less a donation."

Defendant Wagnon on direct examination:

"Q. * * * You heard Mr. Patterson testify that he had an agreement with you to pay you for his transportation from Brookley Field to Mobile. Is that so or not so? A. There was no agreement made before he started riding, no, sir.

"Q. Do you recall when you first started riding Mr. Patterson? A. Not to the very day I don't.

"Q. Had you been riding him for any length of time before anything was said about any money at all? A. About two weeks.

"Q. And then, state to this jury here, as well as you can recall, just what the conversation was at that time. A. Well, we had started to the car that afternoon, and he gave me 50 cents. We had both been riding with a. fellow named Bodo Hilson. So he gave me 50 cents, and said: Here's 50 cents. That's what I been paying Bodo and I'm going to pay it to you. He said: I feel like I ought to give it to you.

"Q. And what did you state to him? A. I told him it was perfectly all right with me, but as far as charging him was concerned, I did'nt expect nothing out of anybody—that I don't believe in asking anybody for anything for riding with me.

"Q. Did you feel you were under any obligation to him to ride him to work because of that money he handed you? A. I didn't feel that way, no, sir.

"Q. Were you operating your automobile strictly for your own convenience? A. That's right.

"Q. As a matter of fact, you and Mr. Patterson were old friends, weren't you? A. That's right, and had been for a long time.

"Q. And if he had stopped paying you that 50 cents you would have kept right on riding him, wouldn't you? A. Sure.

"Q. How long had you and Mr. Patterson been working together? A. I guess about a year or more.

"Q. Mr. Patterson was riding with you all the way up to Church and Cedar Streets? A. That's right.

"Q. About how far is Church and Cedar Streets from the place where the two of you all got in your car at Brookley? A. I would think it was approximately three and a half miles. Or something like that. Maybe three miles.

"Q. Was he giving you 50 cents a week or 50 cents every two weeks? A. 50 cents every two weeks.

"Q. How many times a week were you riding him from Brookley Field up to Church and Cedar Streets? A. Five times.

"Q. That's ten times every two weeks? A. Yes. * * *"

The only case previously before this court on the question presented here is that of Blair v. Greene, 247 Ala. 104, 22 So.2d 834, but the facts therein were different from the instant case.

There is a full annotation on the subject in 10 A.L.R.2d 1351. See also 60 C.J.S., Motor Vehicles, § 399(5), P. 1008 and 5 Am.Jur. 634, Automobiles, § 239.

We have not found, nor have the parties cited, a case directly in point with the facts in the instant case. We propose to quote extensively from the case of Hasbrook v. Wingate, 152 Ohio St. 50, 87 N.E.2d 87, 89, 10 A.L.R.2d 1342, for the reasons that the Ohio Statute and ours are identical, the Supreme Court of that state has construed the statute several times, the opinion cites numerous decisions from many jurisdictions, and we think it correctly and clearly states some of the law applicable to cases of this nature. The summary of the decision at 10 A.L.R.2d 1342 reads:

"A woman who customarily rode in an automobile with her son-in-law, at whose home she lived, to their common place of employment occasionally,

when he bought gasoline, contributed a dollar towards the purchase price. Riding with him enabled her to leave her own car at home for the use of her daughter, the son-in-law's wife. In view of the family relationship these circumstances were held not to make her a paying passenger rather than a guest and as such entitled to recover for the ordinary negligence of the son-in-law in the operation of the car."

The following appears in the opinion in Hasbrook v. Wingate, supra:

"In 2 Restatement of Torts, 1273, Section 490, the designation of 'passenger' as one carried for hire or reward, as distinguished from 'guest' as one carried gratuitously, that is, without any financial return except such slight benefit as is customary as part of the ordinary courtesy of the road, has been adopted. For convenience, these terms will be adopted in this opinion to distinguish a person who has paid for his transportation within the meaning of the statute from one who has not made such payment. * * *

"What is meant by the words of the statute, 'payment therefor,' as referring to transportation and as applied to the facts in this case? In the case of Duncan v. Hutchinson, 139 Ohio St. 185, 188, 39 N.E.2d 140, 142, we said: 'Keeping in mind the purpose of the statute, it would seem that any expense money paid by a person for a ride in an automobile which is not substantially commensurate with the cost of such transportation will not take him out of the guest status fixed by the statute, unless payment for transportation as such was actually agreed upon. The justice of this rule is based on the fact that it would be unfair to hold the motorist to liability for injuries to his guest due to the hazards of transportation, unless the motorist is, in turn, compensated for such transportation in a manner substantially commensurate with the cost and the hazards of the undertaking.'

"See Chooljian v. Nahigian, 273 Mass. 396, 173 N.E. 511; Gage v. Chapin Motors Inc., 115 Conn. 546, 162 A. 17; Blanchette v. Sargent, 87 N.H. 15, 173 A. 383; Luebke v. Hawthorne, 183 Or. 362, 192 P.2d 990.

*    *    *    *    *    *

"The general rule is that if the transportation of a rider confers a benefit only on the person to whom the ride is given, and no benefits other than such as are incidental to hospitality, good will or the like, on the person furnishing the transportation, the rider is a guest; but if his carriage tends to promote the mutual interest of both himself and driver for their common benefit, thus creating a joint business relationship between the motorist and his rider, or where the rider accompanies the driver at the instance of the latter for the purpose of having the rider render a benefit or service to the driver on a trip which is primarily for the attainment of some objective of the driver, the rider is a passenger and not a guest. 60 C.J.S. Motor Vehicles, § 399 (5), pages 1012, 1013; Scholz v. Leuer, 7 Wash.2d 76, 109 P.2d 294; Peery v. Mershon, 149 Fla. 351, 5 So.2d 694. See Chaplowe v. Powsner, 119 Conn. 188, 175 A. 470, 95 A.L.R. 1177; Eubanks v. Kielsmeier, 171 Wash. 484, 18 P.2d 48; Clendenning, Adm'r v. Simerman, 220 Iowa 739, 263 N.W. 248; Liberty Mutual Ins. Co. v. Stitzle, 220 Ind. 180, 41 N.E.2d 133.

"In testing a 'passenger' status, much significance must be given to the meaning of the apt term, 'payment,' used in the statute. 'Payment' is defined as 'the delivery of money as payment, in the course of business. * * * More specifically, in law, the discharge of a pecuniary obligation by money or what is accepted as the equivalent of a specific sum of money; "the satisfaction, by or in the name of the debtor, to the creditor, of what is due, with the object to put an end to the obligation" * * *. The thing given in

discharge of a debt or fulfillment of a promise * * *.' See Century Dictionary, Encyclopedia Ed.

"It is quite apparent that, running through the denotation of the word 'payment,' there is the implication of debt or obligation either expressly or impliedly assumed and its satisfaction and discharge in some kind of specificity and equivalence. There must be some mutual intention on the part of both the rider in and the driver of the motor vehicle to create the status of 'passenger' before it can come into being, and this mutual intention must have its consummation before and not after an accident to the rider. This excludes the idea of the status of 'passenger' being created through mere courtesies or gratuities extended to the driver by the rider.

"Of course, if the owner of a motor vehicle insists upon an arrangement by which a person riding with him is obligated to share the expense of a trip, the provision thus made will preclude the relationship of 'host' and 'guest' notwithstanding the trip may have a social aspect. McMahon v. De Kraay, 70 S.D. 180, 16 N.W.2d 308."

As shown by the summary, and the application of the facts of that case to the law, the decision turned largely on the family relationship of the parties and it was held that plaintiff failed to prove a "passenger" status.

The rule is stated in 60 C.J.S., Motor Vehicles, § 399(5), p. 1015; thusly:

"*Effect of sharing expenses.* It is a general rule of wide acceptance that the sharing of the cost of operating the car on a trip, when the trip is undertaken for pleasure or social purposes and the invitation is not motivated by, or conditioned on, such contribution, is nothing more than the exchange of social amenities and does not transform into a paying passenger one who without the exchange would be a guest. On the other hand, where the offer of transportation is conditioned on the contribution of the passenger toward the expenses, or where it appears that the agreement for transportation bears one or more of the indicia of a business arrangement, and especially where such arrangement is specifically for transportation, or comprehends a trip of considerable magnitude, or contemplates repeated and more or less regular rides, the person paying for gasoline and oil consumed or other automobile expenses is held to be a passenger and not a guest, and this is true even though the ultimate purpose of the arrangement may be for pleasure. Each case involving the question must be decided on its own facts, and the important factor to determine is the intent of the parties."

For recent decisions construing statutes similar to the Alabama statute, see Engle v. Poland, Del.Super., 91 A.2d 326, and Harris v. Harfmann, 113 Cal.App.2d 615, 248 P.2d 501.

The Supreme Court of Pennsylvania construed the Delaware statute in Kerstetter v. Elfman, 327 Pa. 17, 192 A. 663, 664, where plaintiffs were going on a fishing trip with defendant, whom they had never met prior to starting on this trip and the members of the party agreed before starting that all expenses including gasoline and oil would be shared equally and one plaintiff was to act as temporary paymaster and be subsequently reimbursed by the others, and said:

"(2, 3) It will be noted that, in order for the act to apply so as to protect the owner or operator of the car from liability for merely ordinary negligence, two circumstances must exist: (1) The injured rider must be a 'guest' of the owner or operator; and (2) the latter must not receive 'payment' for the transportation. The statute thus recognizes that a guest may be a person who is not entertained gratuitously but who pays for the service rendered to him. A common illustration

of a paying guest is the 'guest' of a hotel. In the present case plaintiffs undoubtedly were guests of defendant in the sense that he was transporting them in his automobile. The question remains, however, was he without payment for their transportation, or, to state it differently, did their contribution toward the expenses of oil and gasoline constitute a payment to defendant—not necessarily a full or a reasonable payment, but any payment?

"This question would seem almost to answer itself. Had plaintiffs not made their agreement to share the expenses, defendant himself would have been obliged to pay for all the gasoline and oil consumed, and since the presence of plaintiffs in the automobile did not add in any way to the cost of operation of the car, the money furnished by plaintiffs was a clear contribution, a net saving, to defendant, reducing the amount which he would have been required to expend had he been transporting plaintiffs gratuitously. Suppose, for example, that the expenses had been calculated in advance and plaintiffs had actually paid their proportionate share to defendant before starting on the trip, stating that they were giving him the money in consideration of his transporting them to Lewes. It would seem clear that defendant would be receiving a 'payment' for their transportation. And yet the facts thus assumed are substantially in legal identity with those in the present case."

In Vol. 4 Blashfield's Cyclopedia of Automobile Law and Practice, p. 326, § 2292, we find:

"Where a dispute exists as to what were the respective purposes or conditions for or upon which the transportation was undertaken, relative to the nature and existence, if any, of the benefits conferred upon the respective parties, it is ordinarily a question of fact whether or not the invitee was a guest within the meaning of the statutes.

"Where, however, reasonable minds can reach but one conclusion from the uncontroverted facts, the question becomes one of law for the court."

As can be seen from the testimony, it is undisputed that Patterson had been transported regularly by Wagnon and had made a "payment therefor" every pay day for six or eight months prior to the accident. We cannot say from the evidence that, as a matter of law, there was no agreement on the part of Patterson to pay and on the part of Wagnon to receive a sum certain every pay day to be applied on the gasoline expenses incurred by Wagnon.

█ In the instant case we think the question of whether Patterson at the time of the accident was a passenger in the automobile or a gratuitous guest was a question for the jury, and not one of law for the court. Blair v. Greene, supra.

Appellant complains that the matter of insurance was improperly injected into the trial of the case in two instances. For an account of the first, we quote from appellant's brief. (The statement in brief is supported by affidavit and appellee concedes it to be true.)

"When the case was called for trial, and before the jury was impaneled, Mr. Armbrecht, one of the attorneys for the Defendant, Wagnon, handed the trial Judge a piece of paper on which were written the words 'State Farm Insurance Company' and he whispered to the trial judge that said company insured the defendant, Wagnon, and requested that the jurors be qualified as to their interest in said company. Thereafter, Mr. Armbrecht personally informed Plaintiff's counsel that he had handed the judge said slip of paper and had requested the judge to qualify the jury with respect to said company. Mr. Wilson made no objection to Mr. Armbrecht's action as aforesaid but,

later, when the judge started to qualify the jury, Plaintiff's counsel stated to the Court in the presence and hearing of all the jurors, 'I wish to ask the Court to qualify the jury as to whether any member of the jury is a stockholder, agent or employee of the State Farm Insurance Company. I am informed that one of the Defendants, Wagnon, has insurance with this company.' This was objected to by Wagnon's counsel and the Court sustained the objection, but stated that it did not make any difference if one or both defendants were insured, and Wagnon's counsel excepted to the Court's statement."

■ It is obvious that the defendant Wagnon did not raise a matter to be considered on appeal merely by taking an exception to the trial court's statement when his objection was sustained. Sovereign Camp, W. O. W. v. Gunn, 224 Ala. 444, 140 So. 410; Hooper Cafe Co. v. Henderson, 223 Ala. 579, 137 So. 419. The same question was raised in Vredenburgh Saw Mill Co. v. Black, 251 Ala. 302, 37 So.2d 212, and there the defendant went further and moved for a continuance, which motion was overruled and an exception taken to the ruling on the motion.

The other question concerning insurance arose while plaintiff was on the stand on direct examination. In that connection the record discloses the following:

"Q. When did you next see Mr. Joseph Wagnon? A. He came out to the house to see me I imagine about a month afterwards, or about six weeks after the accident.

"Q. Did Joe have anything to say about the accident? A. He wanted to know how I was getting along and all. He told me I didn't have anything to worry about, that the insurance company was going to take care of everything.

"Mr. Armbrecht: We object to that, if the Court please. We object to the witness' statement, as to the statement made by Mr. Wagnon—that he has nothing to worry about, that the insurance would take care of it. We move for a mistrial in the case.

"Mr. Wilson: I'd like to be heard on that. I have a case—

"Mr. Armbrecht: I'd like to ask the jury be excluded.

"Court: It is unfortunate for this insurance business to be injected into this case. Insurance has absolutely nothing to do with this case one way or the other. When the question was asked, what the defendant said, I thought or expected him to show that he either admitted some act or fact that might tend to show admission or guilt of negligence or what is charged in the complaint. I had no idea that he was going to bring out about some insurance. Whether a person is insured or not has nothing to do, gentlemen of the jury, with the right of a person to recover or not recover. It is a fortunate thing when they are insured, if they do get a judgment, and it is unfortunate if they are not insured, but it is an immaterial thing insofar as the arriving at a just verdict by the court or jury, as to guilt of negligence or wantonness as charged or contributory negligence as charged. This case has been on this docket since 1950. I don't want to declare a mistrial. If I did so, it would be because I thought the jury was prejudiced, and I do not believe this jury is going to be prejudiced after I explain to them the law. I think they are capable of disregarding the question of insurance and try the case on its merits, and I am going to deny the motion for a mistrial, but instruct the jury not only on this question, but on all the way through this case: please disregard any question in your mind as to whether this defendant or either of them is insured. We would never get a law suit tried if everything we get in a trial and something pops up that is prej-

udicial, we declare a mistrial. We just have to leave it to the jury to help the Court eliminate the harm, if any has been done. Let's try it on the merits, see whether these people are guilty of negligence as charged or wantonness as charged, whether it was the proximate cause of the injury, or whether or not, as charged in one of the pleas, the plaintiff is guilty of any contributory negligence. Let's study the truth of the case and a true verdict render from the facts and the evidence, neither because a person is injured or not. I believe the jury can do it. I know I can do it, and while I might subconsciously let it affect me, I hope I don't, and I don't believe this jury will with these instructions I have given them. Now, let's leave out the insurance from here on, if any, and try the case on whether or not the defendants have committed any acts of negligence—that is what I thought you were going to ask the defendant about admitting. Overrule all objections, all motions, and let's proceed.

"Mr. Armbrecht: We except. * * *"

■ A similar situation was considered in the case of Cannon v. Scarborough, 223 Ala. 674[4], 137 So. 900[4], where it was held that irresponsive testimony showing that the defendant motorist was insured, followed by a motion to discharge the jury, which was overruled, and proper instructions by the court to the jury to exclude such remark from its consideration, was sufficient to remove its hurtful consequences. The question in the instant case called for proper evidence, and the reference to insurance in the answer was clearly irresponsive. See 4 A.L.R. 2d 784, § 12, and 95 A.L.R. 399, § 5.

The assignment of error relating to the denying of the motion for a new trial, as argued, presents the contention that even though defendant Wagnon was admittedly driving at an unlawful speed into an intersection where the view was obstructed, his negligence, if any, was not the proximate cause of plaintiff's injuries.

Title 36, § 5, Code of 1940, restricting speed provides in part:

"Fifteen miles an hour when approaching within fifty feet and in traversing an intersection of highways when the driver's view is obstructed. A driver's view shall be deemed to be obstructed when at any time during the last fifty feet of his approach to such intersection, he does not have a clear and uninterrupted view to such approach to such intersection and of the traffic upon all of the highways entering such intersection for a distance of two hundred feet from such intersection."

It is admitted that the testimony of Police Officer Jacobs sufficiently established that the intersection where the accident happened presented an obstructed view within the meaning of the statute.

■ The question in cases of this nature is one ordinarily for the jury, and whether the defendant Wagnon's speed in violation of the statute proximately contributed to the collision in view of his right of way and whether it was due solely to the negligence of defendant Weeks, were questions for the trier of the facts. Roe v. Brown, 249 Ala. 425, 31 So.2d 599. We find nothing in the case of McCloud v. Williams, 257 Ala. 611, 60 So.2d 339, which conflicts with the above, because it is plainly stated in the latter case that the 15 mile speed limit of the statute has no application.

The trial court did not err in refusing the affirmative charge with hypothesis requested in behalf of defendant Wagnon.

The judgment of the lower court is affirmed.

Affirmed.

LIVINGSTON, C. J., and LAWSON and STAKELY, JJ., concur.